**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14-cv-369 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff Daniel Martinez's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and for a new trial pursuant Federal Rule of Civil Procedure 59 [259] and Defendants' bill of costs [260].[1]  For the reasons set forth below, Plaintiff's motion for judgement as a matter of law and for a new trial [259] is denied. Defendants' bill of costs [260] is granted as modified, and they are awarded $9,902.78 in costs.

## I.     Background[2]

On January 17, 2012, at approximately 3:30 p.m., two Chicago police officers attempted to conduct a traffic stop after observing a vehicle run a stop sign.  The driver, Alberto Martinez, abandoned his vehicle, fled on foot, and tossed a .357 revolver as he ran.  One officer, Reynaldo Nunez, pursued Alberto on foot as he ran through an alley, across several streets, and entered a residence on 55th Street and Talman Avenue in Chicago.  The other officer recovered the gun, secured Alberto's vehicle, and then drove to 55th and Talman.  The police dispatcher and Officer Nunez called for backup.  Several units from nearby police districts responded.  The units were

---

[1] In accordance with Federal Rule of Appellate Procedure 4(a)(4)(A)(iv)–(vi), the 30-day time period for Plaintiff to file an appeal runs from the date of this order.

[2] In this opinion, the Court has recited the relevant facts consistent with the standards that apply to Federal Rule of Civil Procedure 50 and 59 motions, as set out in greater detail below.

warned that they sought a "person with a gun" and advised to "use caution." [250-3, at 34.] Officer Nunez described Alberto as a Hispanic male with braids or a ponytail. [259-5, at 48.]

The building at the corner of the 55th Street and Talman Avenue has two addresses: 2622 West 55th Street (where Alberto lived) and 2624 West 55th Street (where Alberto's brother, Plaintiff Daniel Martinez lived). The building has one garage and one fence surrounding a common backyard. Recordings of the police radio transmissions during the pursuit of Alberto describe the residence as "55 and Talman" (and similar variations) as well as 2622 West 55th Street. Officer Nunez used words like "building," "house," and "residence" to describe the location in his radio transmissions. [295-3, at 153.]

Once Officer Nunez was inside 2622 West 55th Street, he asked the occupant, Vanessa Martinez (Plaintiff's sister), about the fleeing suspect. She pointed to the rear of the building. When Officer Nunez got to the backyard, Alberto could not be found. Vanessa later told another officer that the person who ran through the house might be her brother Alberto, and the officer radioed that the suspect's name was Alberto Martinez. Officer Nunez also radioed that the suspect "definitely went for 55th Street through the house, heading back north. He more than likely jumped over the fence." [259-5, at 72.]

Within minutes, other police units arrived at 55th Street and Talman, and they began searching the area. Among them were Officer Thomas Buehler and Defendant Officer Jeffrey Weber, as well as Defendant Officer Juan Chavez, who arrived separately. As Officers Weber and Buehler arrived, it was announced over the radio that the building was Alberto's "residence." [259-3, at 38–39.] It was also announced that the suspect was wearing a gray shirt. *Id.* at 7. Although the suspect here had tossed his revolver while running, officers are trained that "if there is one gun, there is a good likelihood there's two" guns. *Id.* at 8.

Officer Buehler searched the backyard. *Id.* at 6. Officer Weber entered the residence through the side door on Talman Avenue, and conducted a search of the residence for the suspect. *Id.* at 220, 231. When he entered the building at 55th Street and Talman, he thought that it was one residence. [259-4, at 115.] Officer Chavez entered 2622 West 55th Street through a rear door, which was not posted with address markers differentiating the two units. [259-3, at 155, 170–71.] Officer Chavez searched the unit, and then went into the alley in back to continue his search. *Id.* at 155.

At roughly the same time, Plaintiff and his friend, Alexander Matias, drove back to 55th and Talman, having returned from buying new work boots from Sports Authority and food from McDonalds. Like his brother, Plaintiff's hair was chest-length, often worn in a ponytail. [259-2, at 130.] When Plaintiff and Matias arrived, multiple police vehicles were on the scene. Matias testified that he noticed the cop cars when they arrived. *Id.* at 71. He testified that Plaintiff left the car and "went to his house to see what was going on," while Matias stayed behind to gather up all of their belongings and garbage. *Id.* In contrast, Plaintiff testified that he did not notice any police officers around his property, did not expect to see any officers when he went inside his house, and did not run into his house. *Id.* at 125, 130, 182–84, 213–14. When Officer Buehler later found the vehicle, it was still running with the key in the ignition. [259-3, at 65.]

When Plaintiff entered his home, he found his niece, Zanyda Martinez on the couch watching the cartoon Arthur, and Officer Weber standing next to her. Zanyda testified that she could see that Officer Weber was in full police uniform and knew he was a police officer. [259-2, at 23.] Plaintiff testified that it was too dark for him to tell if Officer Weber was a police officer because the curtains in the room were closed. *Id.* at 132. He described Officer Weber as an unknown "man in the black coat." *Id.* at 137. Officer Weber testified that Plaintiff matched

3

the description of the gunman (male, Hispanic, long hair, last name of Martinez) except that Plaintiff was wearing a red shirt. [259-4, at 49, 117.]

There were several conflicting accounts of what happened next, although everyone agrees that the entire interaction lasted fewer than 20 seconds. Zanyda testified that after Plaintiff walked out of his bedroom, Officer Weber and another officer grabbed Plaintiff and took him to the ground. [259-2, at 37.] She testified that Plaintiff did not pull away, flail his arms, or throw any punches. *Id.* at 38. At one point she testified that she could not remember what was said, but she later testified that Plaintiff was ordered to get to the ground, he kept saying "what's going on?" but "they just put him down." *Id.* at 37, 51.

Plaintiff testified that he asked the black-coated man, "Hey, who the F are you and what are you doing here?" as soon as he walked in the house. *Id.* at 137. The unidentified man said, "Get on the ground. Get on the ground," to which Plaintiff kept saying "Who are you? What are you doing here? This is my house. Get out." *Id.* Plaintiff then started to walk toward the front door, and someone stomped on his foot, grabbed his arm, pulled him down, and handcuffed him. *Id.* at 203–04. Plaintiff testified that the man in the black coat never identified himself as a Chicago Police Officer, told him why he was there, or showed him a warrant. *Id.* at 213–14. He also denied pulling away or flailing his arms. *Id.* at 214. Plaintiff later admitted that he was angry, used "a number of 'F' words," was repeatedly "order[ed]" to get down, he did not follow those orders, but instead continued to move toward the door. *Id.* at 187, 215–17.

Officer Weber testified that upon seeing Plaintiff, Plaintiff said "We didn't 'F'ing call you" followed by a "series of f*ck yous, get the f*ck out of here." [259-4, at 115.] Officer Weber testified that, at this point, he believed he was encountering the gunman. *Id.* at 115, 117. Officer Weber stated that he intended to detain Plaintiff so that other officers could confirm if

this was the person they were searching for, and he ordered Plaintiff to put his hands behind his back. *Id.* at 118. Plaintiff continued directing profanities at Officer Weber, and "was pulling his arms away from" him so that Officer Weber "could not effect an arrest." *Id.* at 118–19. Officer Weber then called for assistance, and Officer Chavez responded to help Officer Weber gain control of Plaintiff. *Id.* at 121. Plaintiff continued to pull away from Officer Chavez and flailed his arms, but was ultimately subdued. *Id.* at 119, 121. Officer Weber told Plaintiff that he was a Chicago police officer, but he could not recall when he said that. [259-4, at 40, 49.]

Officer Chavez testified that he heard Officer Weber radio, "Come back in the house," and Officer Chavez entered the house through the door on Talman Avenue. [259-2, at 247–48; 259-3, at 88.] Officer Chavez also believed that the building on 55th and Talman was one residence. [259-3, at 153.] When he arrived inside, Officer Chavez heard Plaintiff say, "Get the f*ck out of my house" and additional profanities. [259-2, at 250.] At the time, he thought Plaintiff matched the description of the fleeing gunman. [259-3, at 157.] He saw Officer Weber handcuffing Plaintiff's right hand while Plaintiff was "flailing his arms and attempting to break loose from Officer Weber." *Id.* at 158. Officer Chavez went to assist Officer Weber, grabbed Plaintiff's left arm, but Plaintiff broke away from him. *Id.* at 158. After using a technique called an "emergency takedown," Plaintiff was placed in handcuffs. *Id.* at 159.

Following his arrest inside the house, Plaintiff was escorted outside to a police squad car. Plaintiff testified that three male officers arrested him. [259-2, at 141.] The jury also heard several accounts of what transpired outside of the house. Plaintiff testified at trial that once he was in the squad car, Defendant Officer Allyson Bogdalek looked through the window and said, "Oh, that's not him. That's Daniel Martinez. That's the little brother, but lock him up anyway." *Id.* at 148–49. The jury heard that Plaintiff had testified at his deposition that Officer Bogdalek

had said only, "'No, that's not him; that's Danny.' And that was it." [259-5, at 99.] Matias testified that Officer Bogdalek said, "I don't care. Take him anyways. I don't care. I don't give a f*ck." [259-2, at 76.] Officer Weber testified that he did not see Officer Bogdalek at the scene, he does not remember her saying this, and she had nothing to with his decision to arrest Plaintiff. [259-4, at 148–49.] At Plaintiff's criminal trial, Officer Weber had testified that Officer Bogdalek was present at the scene. [259-3, at 227.] Officer Chavez did not recall seeing Officer Bogdalek at the scene. *Id.* at 256. He testified that once he escorted Plaintiff outside of the house, Officer Nunez identified Plaintiff as "Danny," not Alberto. [259-2, at 254.] Nevertheless, it was only once Officer Chavez was back at the police station that he learned that Plaintiff was not the fleeing gunman they had been searching for, but was his brother. *Id.* at 259.

At the police station, Officers Weber and Chavez signed two criminal complaints against Plaintiff for resisting arrest and obstructing a police officer in violation of 720 ILCS 5/31-1(a)— a total of four misdemeanor offenses. However, Plaintiff's arrest report has a box that says "resisted arrest?" and the report says, "no." [259-2, at 264–65.] Both obstruction charges state that Plaintiff "knowingly resisted the performance of his lawfull [sic] duties as a peace officer by blocking P.O Chavez['s and P.O. Weber's] access to a room while he was attempting to locate and arrest a person wanted for illegal possession of a firearm." [259-7; 259-9.] Officer Chavez also testified that he was informed at the station that Plaintiff had a pending lawsuit against Officer Weber and Officer Bogdalek. *Id.* at 260.

Officers Chavez and Weber met with the State's Attorney before Plaintiff's criminal trial [259-2, at 261], but only Officer Weber testified at the trial. Officer Bogdalek was not involved in preparing Plaintiff's criminal complaints and did not testify against Plaintiff at his criminal bench trial. [259-2, at 197; 259-3, at 177; 259-4, at 148.] In fact, it was stipulated that Officer

Bogdalek failed to appear to testify at a pretrial hearing in response to a subpoena from Plaintiff's attorneys. [259-5, at 21.] Plaintiff was ultimately acquitted, and this civil suit followed. In 2016, Plaintiff went to trial against Officers Weber, Chavez, and Bogdalek, asserting claims for unlawful entry of his home, unlawful search of his home, illegal seizure, false arrest, conspiracy, retaliation, and malicious prosecution. On July 19, 2016, following a six-day jury trial, the jury returned a verdict for Defendants on all counts. Plaintiff now seeks judgment as a matter of law and a new trial.

## II.     Legal Standard

On a motion for judgment as a matter of law under Federal Rule of Civil Procedure ("Rule") 50, a court must determine whether the evidence presented at trial when viewed in the light most favorable to the non-moving party is sufficient to support the verdict. *Massey v. Blue Cross–Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000); see also *Hall v. Gary Cmty. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). Although a "mere scintilla" of evidence is not sufficient to sustain a verdict, the Court is not to substitute its view of the contested evidence in place of the jury's determination. *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004). The Court will not set aside a jury verdict if—viewing the evidence in the light most favorable to the prevailing party—there exists within the record any reasonable basis to support the verdict, leaving issues of credibility and weight of evidence to the jury. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (citation omitted). The test is whether "no rational juror could have found for the prevailing party." *Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002); see also *Emmel v. Coca–Cola Bottling Co. of Chi.*, 95 F.3d 627, 630 (7th Cir. 1996).

A motion for a new trial is governed by Rule 59(a), which says that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir.

2014). When considering whether the jury's verdict goes against the manifest weight of the evidence, the Court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011) (citations omitted). But "[a] verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). "Jury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Id.* (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)).

## III. Rule 50 Motion

Plaintiff argues that he is entitled to judgment as a matter of law on his unlawful search, unlawful seizure, unlawful arrest, and malicious prosecution claims, which the Court addresses in turn. Plaintiff does not assert that he is entitled to judgment as a matter of law on his conspiracy or retaliation claims (Claims 5 and 6), and the Court does not address those claims.

### A. Unlawful Entry and Search Claims

While police generally need a warrant to enter a home, "warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003). "Recognized exigencies include situations in which the occupant of a residence is injured or is in danger of imminent injury; when there is a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at the police or other persons; when police are in 'hot pursuit' of a fleeing suspect, or there is a risk that the suspect may escape; and to prevent the imminent destruction of evidence." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014) (internal citations omitted).

The Court instructed the jury as follows:

> Exigent circumstances include (1) the 'hot pursuit' of a fleeing suspect; (2) the need to prevent a suspect's escape; and (3) the need to address the risk of danger to police or to other persons inside or outside the dwelling. Specifically, in this case, there were exigent circumstances for a warrantless entry if: 1. All of the circumstances known to the Defendant you are considering would cause a reasonable person to believe that entry into the residence was necessary to address an exigent circumstance, and 2. There was insufficient time to get a search warrant.

[253, at 25.] Plaintiff contends that there was insufficient evidence to establish *any* exigencies.[3] Viewing the evidence in the light most favorable to Defendants, the Court cannot agree.

"Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." *Kentucky v. King*, 563 U.S. 452, 460 (2011). The "Court conducts an objective review" to "determine if exigent circumstances existed." *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006). "[A] police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search." *Bogan*, 644 F.3d at 571 (citation and internal quotation marks omitted).

Here, the jury heard testimony that officers were (1) chasing a fleeing suspect who had been armed; (2) the suspect had fled into his home; (3) the police are trained that armed suspects might have another weapon; and (4) the suspect had not been caught. The jury saw photographs of the building at 55th Street and Talman Avenue with its single garage, single fence, common architecture, common backyard, and rear doors that lacked address markers. The jury heard audio recordings referring generally to "55th and Talman" [259-5, at 21] or "2622 West 55th Street in the building" [259-3, at 80] or other descriptions that refer to a single "home" or

---

[3] Specifically, Plaintiff argues that Defendants "failed to make a prima facie showing of exigency." [259, at 31.] Defendant's burden is one of production, not persuasion. *Bogan v. City of Chi.*, 644 F.3d 563, 571 (7th Cir. 2011) ("Because the officers had come forward with evidence of exigent circumstances, the only question posed to the jury was whether [plaintiff] had met her ultimate burden of showing that the police did not reasonably believe that [suspect] would be found in [plaintiff's] apartment. The district court's instruction on burden of proof correctly and clearly stated the law[.]")

"residence." Multiple officers (including Officers Weber and Chavez) testified that they thought the building was a single residence. Indeed, members of the Martinez family lived in both units. There was more than sufficient evidence for a reasonable jury to conclude that a reasonable officer could have believed that the building at 55th Street and Talman Avenue was a single family home, Plaintiff's home (2624 West 55th Street) was part of the fleeing suspect's home, the exigency created when Alberto fled from police had not yet abated because Alberto had not yet been caught, and it was necessary to search the residence in connection with this exigency. In light of these facts, a reasonable jury could find the existence of exigent circumstances justified Defendants entry into 2624 West 55th Street, and thus a warrantless search was proper.

Although he seeks judgment as a matter of law under Rule 50, Plaintiff's argument ignores *all* of these facts and instead offers a selective snapshot of the testimony that purportedly supports his case theory. For example, Plaintiff emphasizes that Officer Weber lacked knowledge of the suspect's location when he entered 2624 West 55th Street. [259, at 31.] Of course, *none* of the searching officers "knew" Alberto's location. That is why they were still searching for him, including in the location where he was last seen—his home. Plaintiff notes that other officers had searched the yard and set up a two-block perimeter around the address by the time Officer Weber had arrived. [259-5, at 72.] He also points out that Officer Nunez had radioed that Alberto "more than likely jumped over the fence." *Id.* None of this testimony negates the fact that the officer's search continued or makes it unreasonable as a matter of law for officers to continue to search the suspect's home for him or evidence of where he might be. Similarly, Plaintiff also argues that Officer Weber "had no affirmative reason to believe Alberto had fled into 2624 W. 55th Street." [259, at 32.] But the photographs, audio recordings, and testimony were sufficient for the jury to conclude that a reasonable officer would have thought

that this was one residence. Thus, Plaintiff's argument that Defendants lacked any reasonable basis to be inside 2624 West 55th Street rather than 2622 West 55th Street falls apart.[4]

Plaintiff asserts that "[b]ecause Defendants did not know where Alberto was hiding, Defendants cannot claim they entered Danny's home to prevent his escape." *Id.* at 33. Similarly, although he acknowledges there is "no doubt that Alberto's flight created a danger," Plaintiff calls it "rank speculation" that Alberto might be attempting to obtain another gun and "Defendants could not draw any nexus between entry into the home and the generalized danger presented by flight." *Id.* It was undisputed, however, that Alberto had been armed and thus presented more than the "generalized danger" present with "all fleeing suspects." *Id.* The jury heard testimony and recordings in which the police dispatcher announced that they were seeking a "person with a gun" and were advised to "use caution." [259-3, at 34; 259-5, at 53.] The jury also heard testimony that officers are trained to recognize that the presence of one gun can often indicate the presence of multiple guns. [259-3, at 8.] Plaintiff may dispute the factual premise underlying that testimony (which he did not object to), but that does not mean the "record is devoid of evidence" [259, at 33] by which a rational jury could conclude that a reasonable officer would think that this suspect, who had run into his home, might have secured another weapon that could pose a danger to others in the home (such as Vanessa or Zanyda).

Furthermore, Plaintiff cites no case law holding that it is unreasonable as a matter of law for officers following a fleeing suspect running through his home to enter that home to prevent the suspect's escape or ensure he does not gain another weapon and pose a danger to others. Cf.

---

[4] Plaintiff argues that Officer Weber "believed" Alberto had jumped the fence [277, at 5], but ignores that his testimony here was inconsistent. [See 259-3, at 213 (denying he could recall hearing this transmission); *id.* at 230–31 (claiming he entered the house because other officers were present searching for the suspect in the house). The testimony that Plaintiff cites involves whether Officer Weber had the impression that Officer Nunez saw the suspect jump the fence [259-4, at 100], but Officer Weber does not actually state that this is what he thought on January 17, 2012. Regardless, it was up to the jury to resolve the *many* inconsistencies in the testimony they heard from Plaintiff and Defendants and their witnesses.

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298 (1967) ("The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them."). "Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that [Plaintiff] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." *Id.* at 299.

Plaintiff also argues that the police should have secured a search warrant. [259, at 33–34.] He contends that the "undisputed evidence showed the police had time to guard the entrances of 2624 W. 55th Street while a warrant was obtained." *Id.* Tellingly, Plaintiff does not provide a cite for this "undisputed evidence." In any event, Officers Buehler and Weber testified that they did *not* have time to get a warrant while they pursuing this fleeing suspect. [259-4, at 23 ("There was no time to get a warrant. That takes lots of time."); *id.* at 97 (securing a warrant takes "several hours"); 259-3, at 46 (Q: "[W]as there time to get a warrant? Let's ask that." A: "Not in a hot pursuit, no.").] Plaintiff also argues that because Alberto had run "in and out of 2622 West Street * * * by the time Weber arrived[,] the exigency had dissipated." [259, at 31.] Accepting Plaintiff's argument would mean that the officers were required to get a warrant to continue to search 2622 West 55th Street for Alberto simply because some officers had suspected Alberto *might* have fled his home. Again, Plaintiff offers no case law or reasoning that would support the proposition that the police's "hot pursuit" had "dissipated" here even though Alberto—a potentially armed suspect—had yet to be found. A jury was entitled to find that the

police's ongoing search of what a reasonable officer would think was the suspect's property was still reasonable and within the hot pursuit's scope, and thus no warrant was required.

Finally, Plaintiff contends that "Weber testified inconsistently" on whether he entered 2624 West 55th Street to join 10 to 15 other officers already searching this residence or he entered the home alone, not knowing where Alberto was. [259, at 32; see also 277, at 3.] "[T]he question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey*, 226 F.3d at 924. Plaintiff cannot ignore the evidence it does not like or argue that the jury should not have believed Officer Weber to secure judgment as a matter of law under Rule 50. Plaintiff's request for judgment as a matter of law on the unlawful entry, search, and occupation claims (Claims 1 and 2) are denied.

### B.     Unlawful Seizure Claim

Plaintiff argues that Officer Weber lacked probable cause to seize Plaintiff and was "deliberately indifferent to every objective factor that would have indicated Daniel was the wrong person in the wrong house." [259, at 35.] Namely, Plaintiff was "wearing the wrong clothing" (a red shirt rather than a gray shirt), was "in the wrong location," and "had the wrong name." *Id.* Again, Plaintiff's motion overlooks every other objective factor that would provide a reasonable basis to believe that Plaintiff *was* the fleeing suspect, and thus there was probable cause to detain seize or detain him. Plaintiff is a Hispanic male, had long hair worn in braids or a ponytail, was the brother of the suspect, had the same last name, and was found close to the place the suspect had last been observed. Officers Weber and Chavez testified that Plaintiff matched the description of the suspect. [See 259-3, at 157; 259-4, at 49, 117.] A detainee's appearance need not match a description perfectly for there to be probable cause to detain him. See

*Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524–25 (7th Cir. 2001) (concluding the officers had probable cause because, "[a]lthough [plaintiff's] appearance did not match exactly the characteristics provided by the two women, he bore a fair resemblance"). Ignoring this evidence does not bolster Plaintiff's entitlement to judgment as a matter of law.

Even so, the jury heard testimony that explained away each "objective factor" Plaintiff offers. Officer Weber denied hearing the transmission where the suspect's shirt color was reported. [259-3, at 196.] He also testified that "[p]eople take off articles of clothing and throw them off to the side" to "change their appearance," and "enough time had passed for someone to change his shirt." [259-4, at 118.] Such an inference is hardly unreasonable. See *United States v. Carpenter*, 342 F.3d 812, 816 (7th Cir. 2003) ("[I]t is generally assumed that robbers will *change* their clothes after the crime to avoid being recognized."). Plaintiff's "wrong location" argument gains no traction since, as explained above, the officers reasonably thought they were in the suspect's home. Indeed, the fact that Plaintiff appeared inside the building at 55th Street and Talman Avenue actually strengthens the case for probable cause because that is where the police thought the suspect might be. In addition, Officer Weber testified that he only remembered hearing the suspect's last name over the radio. [259-3, at 193; 259-4, at 49.] Officer Buehler testified the same. [259-3, at 8.] Officer Weber also testified that, in his experience as a police officer, "people like to lie about their names, cover-up for one another." [259-4, at 117.] Viewing the evidence in the light most favorable to Defendants, the jury could properly conclude that these purportedly "objective factors" did not negate probable cause.

Plaintiff further argues on reply that "even if the Court credits Weber's selective hearing, Plaintiff's seizure was unlawful because Plaintiff was not in flight" and thus "could not match the description of fleeing suspect." [227, at 7.] First, the Court *must* credit Officer Weber's

testimony on a Rule 50 motion. *Kapelanski*, 390 F.3d at 530. Second, Plaintiff offers nothing to support his dubious argument that a fleeing suspect cannot match his description unless he is in the act of "fleeing" at the very moment he is encountered by officers. Probable cause is a "practical, nontechnical conception." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation and internal quotations omitted). The police do not lose probable cause to detain a fleeing suspect simply because he is momentarily standing still. Third, there was testimony from which the jury could conclude that Plaintiff ran from his car into the house [259-2, at 71]—that is, he was "in flight"—and then tried to run away from Officer Weber toward the door once in the home (*id.* at 203–04, 215–17). Thus, there was ample evidence for the jury to find that Officers Weber and Chavez had probable cause to detain or seize Plaintiff, and Plaintiff's motion for judgment as a matter of law on Claim 3 is denied.

## C.       False Arrest Claim

"To prevail on a claim of false arrest, the plaintiff must show there was no probable cause for his arrest." *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010). "Probable cause exists if an officer reasonably believes, in light of the facts known to [him] at the time, that a suspect had committed or was committing an offense. A probable cause determination relies on the common-sense judgment of the officers based on the totality of the circumstances." *Id.* (citation and internal quotation marks omitted). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "[A]n arrest is permissible under the Fourth Amendment if the arresting officer had probable cause to make the arrest for any reason." *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013) (citing *Devenpeck*, 543 U.S. at 153–54). Moreover, "the probable

cause standard permits reasonable mistakes by arresting authorities based on the information then and there available." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001).

For the same reasons that support rejection of Plaintiff's unlawful seizure claim, the jury had sufficient evidence to find that Officers Weber and Chavez had probable cause to arrest Plaintiff as the suspect who had fled on foot from police and thrown his firearm. The parties largely repeat their unlawful detention claim arguments regarding whether Plaintiff sufficiently matched the suspect's description to be arrested. The closeness of their physical appearances, location, and name and surrounding circumstances support the jury's finding that the "officer[s] reasonably believe[d], in light of the facts known to [them] at the time, that a suspect had committed or was committing an offense." *Jackson*, 627 F.3d at 638. Under *Devenpeck*, that is sufficient to deny Plaintiff's request for judgment as a matter of law on his false arrest claim. 543 U.S. at 153–54; see also *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1114 (N.D. Ill. 1997) ("Since defendants had probable cause to arrest [plaintiff] on at least one of the charges, it is unnecessary to determine whether there was probable cause for the other two charges").

The bulk of the parties' arguments, however, concern whether Defendants had probable cause to arrest Plaintiff for resisting and obstructing a peace officer. Illinois law provides that "[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer * * * of any authorized act within his official capacity commits a Class A misdemeanor." 720 ILCS 5/31–1(a). "[T]he statute prohibits a person from a committing a physical act of resistance or obstruction—a physical act that impedes, hinders, interrupts, prevents or delays the performance of the officer's duties, such as going limp, forcefully resisting arrest, or physically helping another party to avoid arrest." *People v. McCoy*, 378 Ill. App. 3d 954, 962 (2008). "'Resisting' or 'resistance' means withstanding the force or effect of or the

exertion of oneself to counteract or defeat." *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 226 (2010). "The acts of struggling or wrestling with a police officer are physical acts of resistance that will support a conviction for resisting a peace officer, even if the underlying attempted arrest is unwarranted." *Id.* While "[v]erbal resistance or argument alone, even the use of abusive language, is not a violation of the statute," *id.*, "[t]he greatest difficulty lies in determining the point at which mere verbal argument or refusal to act becomes an act of physical resistance or obstruction." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 722 (7th Cir. 2013) (collecting cases); see also *People v. Gordon*, 408 Ill. App. 3d 1009, 1016–17 (2011) (affirming obstruction conviction where defendant yelled profanities and threats at officers in a "chaotic" scene).

Plaintiff's motion relies almost exclusively on *People v. Young*, 100 Ill. App. 2d 20 (1968). In *Young*, three police officers attempted to execute a search warrant of Aubrey Young's apartment, but mistakenly entered Willard Young's apartment. *Id.* at 21. When the officers showed the search warrant to Willard's wife, Ruth, she "started screaming, struck [the officer] in the chest with her closed fist, * * * then turned around and picked up a ketchup bottle and attempted to strike the officers." *Id.* The Appellate Court stated that "[t]here was no question that the defendant resisted the police officers," but held that she did not resist an "authorized" act within the meaning of the Section 31-1. *Id.* at 23. The Court concluded that this provision "does not proscribe resistance to an illegal search" in contrast to an unlawful arrest. *Id.* at 24 (explaining that "[t]he mere fact that the legislature has struck a different balance in the case of an arrest does not change this" result). Plaintiff contends that, under *Young*, he had "a right to resist the unlawful search of his home by pulling away" from the officers. [259, at 37.]

There are two main problems with this argument. First, Officer Weber was not just attempting to search or enter Plaintiff's home. When Plaintiff approached Officer Weber inside

Plaintiff's home and Officer Weber determined that Plaintiff matched the description of the fleeing suspect, Officer Weber attempted to arrest and handcuff Plaintiff. [259-4, at 48–49.] Illinois law prohibits a person from using force to resist an arrest "which he knows is being made by a peace officer * * *, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." 720 Ill. Comp. Stat. Ann. 5/7-7; *People v. Pandolfi*, 2014 IL App (1st) 113783, ¶ 41 (explaining that the resisting statute and Section 7-7 "ordinarily override a claim of defense of dwelling because they specifically pertain to the use of force in an arrest situation").[5] In contrast with his trial testimony, Plaintiff "concedes" for purposes of this motion that he "knew Officer Weber was a police officer at the moment of their confrontation." [227, at 9.] Thus, *Young* does not apply and Plaintiff's "resistance of even an unlawful arrest violates [the resisting statute]." *City of Champaign v. Torres*, 214 Ill. 2d 234, 242 (2005) (discussing *People v. Villarreal*, 152 Ill. 2d 368, 376–77 (1992)); accord *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 484 (7th Cir. 2011); *Elvers v. Karlos*, 2015 WL 4483977, at *3 (N.D. Ill. July 22, 2015) ("Viewed favorably to defendants, the record shows that [plaintiff] refused to follow their orders and resisted being handcuffed. That is sufficient to create a triable fact issue as to whether there was probable cause to arrest [plaintiff]" for resisting.).

Second, under *Young*, Plaintiff's authority to resist Officer Weber depended on proving that Officer Weber's search or entry into his home violated the Fourth Amendment. *Torres*, 214 Ill. 2d at 244. As discussed, there was sufficient evidence for a rational jury to conclude no such violation occurred. Thus, "[Plaintiff's] inability to assert a fourth amendment violation is fatal to his [claim]. Without such a violation, [Plaintiff] has no basis for claiming that [Officer Weber's]

---

[5] Plaintiff argues that when an officer "begins to give residents orders to get on the ground or put their hands behind their back, in their own homes, nominal physical resistance is * * * not criminal in nature." [227, at 9.] He maintains that "the constitution does not permit this kind of police power," which Plaintiff characterizes as more "consistent with a police state." [277, at 9.] Such arguments for repealing Section 7-7 or adding a "nominal physical resistance" exception are better directed to the Illinois legislature.

actions exceeded his legal authority and were not 'authorized' within the meaning of the [resisting statute]." *Id.* at 247.

Plaintiff raises a few other arguments, but all lack merit. He claims that because Officer Weber "did not inform Daniel he was under arrest," he "could not have formed the requisite mental state as a matter of law." [259, at 38.] Illinois law is otherwise. See, *e.g.*, *People v. McKinney*, 62 Ill. App. 3d 61, 67 (1978) (holding "it was not necessary for the officers to employ the specific words 'You are under arrest,' in order for defendant's arrest" for resisting to be proper); *People v. Rodriguez*, 2014 IL App (1st) 123264-U, ¶ 11 (affirming resisting conviction because "[o]fficers do not have to use the specific words, 'You are under arrest'"); *People v. Jeffries*, 2014 IL App (4th) 120678-U, ¶ 62 ("Given the violent struggle, a formal pronouncement of arrest was impractical. Instead, defendant was arrested in the sense that he was seized when the officers grabbed him and attempted to place his hands behind his back.").

Plaintiff argues that "the involuntary reflex of initially pulling one's arms away does not a criminal make." [259, at 37.] In fact, Plaintiff denied pulling away his arms at trial [see 259-2, at 214], and he identifies no evidence indicating that his *repeated* pulling away from the officers while they tried to handcuff him was "involuntary." Plaintiff also argues that "the only reasonable inference to be drawn from Plaintiff's pulling away" from the officers "was that he did not understand what was happening to him." [259, at 38.] On reply, Plaintiff argues that he had "no meaningful opportunity to comply" because this interaction took place in a matter of seconds. [277, at 10.] Viewing the evidence in the light most favorable to Defendants, Officer Weber, dressed in full uniform, announced that he was a Chicago Police Officer [259-4, at 49], and asked that Plaintiff place his hands behind his back (*id.* at 53, 118), at which point Plaintiff refused, repeatedly cursed at Officer Weber, attempted to leave, and repeatedly pulled and flailed

his arms to avoid being handcuffed (*id.* at 119). When Officer Chavez was called for assistance and grabbed Plaintiff's arm, Plaintiff broke away and was only fully handcuffed once the officers used an "emergency takedown." [259-3, at 157–159.] Office Weber testified that this encounter lasted 20 seconds (259-4, at 122), and Plaintiff offers no authority holding that this amount of time was insufficient for Plaintiff to comply with Officer Weber's order as a matter of law. Indeed, weighing all of these issues was the jury's job. And based on this testimony, a jury "could reasonably find that [Plaintiff] knew police officers were placing him under arrest, but nevertheless, he resisted." *People v. Swayzer*, 2015 IL App (1st) 131799-U, ¶¶ 22–25 (affirming conviction for resisting where "police officers, wearing their full uniforms" at a domestic disturbance "reached for one of [defendant's] hands," at which point defendant "had to know he was interacting with uniformed police officers attempting to place him under arrest," but defendant began to "flail" and "stiffen" his arms, which led to the officer's placing him in a "bear hug" until both fell to the ground).

Plaintiff further argues that words alone cannot violate the obstruction statute, and he did not give any "false information" or "actually impede" Defendants' investigation. Again, Plaintiff did more than curse at Officer Weber. A reasonable jury could have found that Plaintiff pulled and flailed his arms to avoid being arrested, leading to a struggle with Officer Weber that hindered Officer Weber from determining if Plaintiff was in fact the man the officers were seeking. This struggle required Officer Chavez to stop searching for the gunman to assist Officer Weber subdue Plaintiff. Thus, Plaintiff's physical acts "impede[d], hinder[ed], interrupt[ed], prevent[ed] or delay[ed]" both officers' investigation into and efforts to find Plaintiff's brother, Alberto. *McCoy*, 378 Ill. App. 3d at 962.

Plaintiff also contends that "the basis for Plaintiff's seizure dissipated" when Officers Weber and Chavez learned that they had "arrested the wrong person," at which point Plaintiff's continued arrest became unlawful. [259, 39.] Even assuming that this is the law, it would have no impact on the presence of probable cause to arrest Plaintiff for resisting and obstruction. The fact that Officers Weber and Chavez later learned that Plaintiff was not the fleeing subject does not mean Plaintiff was, somehow, not pulling and flailing his arms to forestall his arrest. Plaintiff was—unquestionably—the only person who committed these offenses, and probable cause to arrest for these charges never "dissipated." Plaintiff's motion for judgment as a matter of law on Claim 4 is denied.[6]

### D.    Malicious Prosecution Claim

In Illinois, malicious prosecution requires a plaintiff to prove "(1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice on defendants' part, and (5) damages resulting to plaintiff." *Boyd v. City of Chi.*, 378 Ill. App. 3d 57, 71 (2007). The parties mainly direct their arguments to whether Plaintiff satisfied the third and fourth elements. The absence of either bars Plaintiff's claim. *Id.*

Plaintiff argues that the "undisputed evidence shows that Defendants Weber and Chavez maliciously prosecuted Plaintiff on all four criminal charges"—namely, the two resisting and two obstruction charges. [259, at 39.] As a threshold matter, Plaintiff makes no argument that he is entitled to judgment as a matter of law against Officer Bogdalek on this claim. As Defendants argue [271, at 23], there was no evidence that Officer Bogdalek was involved in arresting, charging, or prosecuting Plaintiff, and thus she could not have "commenced" criminal

---

[6] Claim 4 was also asserted against Officer Bogdalek, but Plaintiff offers no argument as to why he is entitled to judgment as a matter of law against her on this claim.

proceedings against Plaintiff. See *Smith v. Augustine*, 2009 WL 481639, at *9 (N.D. Ill. Feb. 25, 2009) ("Lability for malicious prosecution extends to police officers 'who played a significant role in causing the prosecution of plaintiff,' and plaintiff must show that the officers used improper influence on the prosecutor or made knowing misstatements to the prosecutor in order to secure prosecution." (citation omitted))

Turning to probable cause, "[i]n a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Williams v. City of Chi.*, 733 F.3d 749, 759 (7th Cir. 2013) (citation omitted). "Errors that are not grossly negligent do not affect the probable cause inquiry when the complainant has an honest belief that the accused is probably guilty of the offense." *Id.* "[W]hereas probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause, probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking." *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) (internal citations omitted).

Regarding the two "resisting" charges, Plaintiff "incorporates" the same arguments that he made regarding his unlawful arrest claim. [259, at 41.] For the same reasons, those arguments are rejected here too. There was sufficient evidence for the jury to find that a person of ordinary care and prudence would believe or entertain an honest and sound suspicion that Plaintiff committed both resisting offenses involving Officers Weber and Chavez. *Williams*, 733 F.3d at 759. Regarding the two "obstruction" charges, Plaintiff argues that errors in the charging documents show that the charges were baseless. Namely, both charges state that Plaintiff

knowingly "block[ed]" Officer Chavez and Weber's "access to a room while he was attempting to locate and arrest a person wanted for illegal possession of a firearm." [259-7; 259-9.] Plaintiff argues that both officers "admit the charge was false" since Plaintiff did not block any room, and the charge cannot be recast as Officer Weber was blocked from "searching for Alberto" since he had thought "he had caught Alberto." [259, at 40.] Defendants argue that these factual mistakes and errors in the charges were mere negligence.

At trial, Plaintiff's attorney actually highlighted the sloppiness with which the charge was drafted, noting the multiple misspellings. [259-4, at 78–79.] Officer Chavez conceded the wording of the charge was a mistake, but disputed that it was an "intentional falsehood." [259-3, at 104.] After he was shown these errors, Officer Weber testified that he "guess[ed] the wording is wrong" referencing "access to a room" and he should have used "hindered" or specified that he "had to take [his] focus off of [his] search and deal with [Plaintiff]." [259-4, at 80.] Consistent with *Williams*, the jury was instructed about errors that fall short of gross negligence [253, at 40], and Plaintiff argued this point to the jury [259-6, at 66–67]. A reasonable jury could conclude that these mistakes were not grossly negligent since the officers honestly believed that Plaintiff's conduct in screaming profanities at them, attempting to flee, and physically resisting them while the officers attempted to handcuff him had obstructed the performance of their duties (*e.g.*, their search for the real fleeing suspect). Plaintiff offers nothing more than rhetoric to support his claim that these mistakes constitute gross negligence as a matter of law.

Plaintiff also contends that the charges show malice. [259, at 41.] In the context of a malicious prosecution claim, malice "means that the officer who initiated the prosecution had any motive other than that of bringing a guilty party to justice." *Williams*, 733 F.3d at 759–60 (citation and internal quotation marks omitted). "[T]he trier of fact *may* infer malice from lack

of probable cause if there is no credible evidence which refutes that inference." *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 647 (2002) (emphasis added).

Plaintiff's main argument is that the erroneous factual predicates in the charge show malice, although he does not articulate how these errors show that the officers had any motive other than bringing Plaintiff to justice for resisting and obstruction. Plaintiff asserts that Officer "Chavez'[s] self-serving reason that he brought the charge by mistake does nothing to avoid the inference of malice." [259, at 41.] But the Court cannot give this record evidence less weight on a Rule 50 motion simply because Plaintiff labels it "self-serving." Regardless, Officer Chavez testified that "the obstruction charge was correct." [259-3, at 108.] He did not testify that he mistakenly filed this charge against Plaintiff. And, ultimately, it was up to jury to decide whether to "infer" malice. *Williams*, 733 F.3d at 760. "[M]alice may not be inferred where probable cause exists," and, as explained, the jury had a sufficient evidentiary basis to find probable cause here. *Flores v. Walgreen Co.*, 2010 WL 3894091, at *11 (N.D. Ill. Sept. 30, 2010) (citation omitted). Plaintiff was not entitled to an inference of malice as a matter of law, and his motion for judgment as a matter of law on Claim 7 is denied.

## IV.     Rule 59 Motion

Plaintiff argues that he is entitled to a new trial because the verdict is against the manifest weight of evidence, Defendants made an "unfairly prejudicial" argument by referring to Alberto Martinez as a "gunman," and the Court erred in three of the jury instructions. Plaintiff also challenges three evidentiary-related issues regarding Alberto's arrest, Officer Bogdalek's testimony, and his prior civil rights lawsuit.[7] The Court takes these arguments one at a time.

---

[7] The introductory paragraph of this section of Plaintiff's motion states that the Court also "allowed defendants to misstate the law on obstruction" [259, at 46], but Plaintiff does not include any argument to support this basis for a new trial in the motion.

A.    **Manifest Weight Of Evidence**

In a single paragraph, Plaintiff "incorporates herein the arguments made pursuant to [Rule] 50," and asserts that "Defendants will need to speak for themselves on what version of the facts is in a light most favorable to them, since there is no way to present the facts in a matter where the Defendant followed the law."  [259, at 43.]  In his reply, "Plaintiff incorporates his argument that the verdict was against the manifest weight of the evidence made in this motion and throughout."  [277, at 12.]  Moreover, although Plaintiff's opening brief omits any discussion of his conspiracy or retaliation claims, "Plaintiff submits" without elaboration "that the Court should allow a new trial on them" too.  *Id.* at 13.

This undeveloped argument is plainly insufficient.  "Plaintiffs face a heavy burden under Rule 59(a)."  *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 2012 WL 669044, at *2 (N.D. Ill. Feb. 29, 2012).  "[N]ew trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."  *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995).  Simply asserting that the verdict was against the evidence and leaving it up to the Court to mine through a movant's brief to fashion an argument in support of that request does not cut it.

Even so, each side presented their theories to the jury, offering testimony that was riddled with inconsistencies.  For example, Plaintiff testified that could not see any police presence when he arrived back home [259-2, at 125, 130, 182–84, 213–14], but Matias said that he saw the police (*id.* at 71).  Plaintiff denied running into his house (*id.* at 130), but Matias testified that Plaintiff left the car to "see what was going on" and left all of his belongings behind (*id.* at 71) while Officer Buehler found the keys were still in the ignition (suggesting that Plaintiff left the

car quickly) [259-3, at 65]. Plaintiff testified that it was too dark for him to tell if Officer Weber was a police officer [259-2, at 132, 137], while Zanyda testified that she knew he was a cop (*id.* at 23). Plaintiff also testified inconsistently at trial and in his deposition about what Officer Bogdalek said to him once he was in the squad car (see *id.* at 148–49; 259-5, at 99). These are just a few of the many conflicts the jury had to sort out. Based on these highly disputed facts, inevitable credibility determinations, and other conclusions discussed *supra* regarding Plaintiff's Rule 50 motion, the Court cannot agree with Plaintiff that "'no rational jury' could have rendered the verdict." *Moore*, 546 F.3d at 427. Plaintiff bore the burden of persuasion on his claims, and the jury was not persuaded. *Bogan*, 644 F.3d at 570. That outcome was perfectly reasonable.

### B.     Defendants' Closing Argument

Plaintiff argues that Defendants "unfairly took advantage of current affairs to prejudice the jury" because the trial "took place between two mass shootings that targeted police officers" and Defendants "argued the case as though an armed gunman threatened to conduct an imminent mass shooting of a Chicago Public School." [259, at 43–44.] Specifically, Plaintiff contends that he was "unfairly" prejudiced by Defendants' repeatedly references to Alberto as a "gunman" or "armed suspect" in closing. *Id.* (collecting examples). Plaintiff also contends that Defendants engaged in a "scare tactic" by referencing the three schools in the area where this incident occurred. Based on this argument, Plaintiff claims he was "denied a fair trial." *Id.* at 44.

Plaintiff does not identify any insistence in which he timely objected to these "gunman" or school references during trial. Nor did he raise this objection in response to Defendants' closing argument. Accordingly, this argument has been waived. *Venson v. Altamirano*, 749 F.3d 641, 657 (7th Cir. 2014); *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). Even if preserved, "comments made by attorneys during closing arguments rarely rise to the level of

reversible error." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 445 (7th Cir. 2010). "Improper remarks during a closing argument warrant reversal of the judgment only if the remarks influenced the jury in such a way that substantial prejudice resulted to the opposing party." *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013) (citation and internal quotation marks omitted omitted). The statement must be "plainly unwarranted and clearly injurious" to constitute reversible error. *Id.* (citation and internal quotation marks omitted omitted).

The Court sees no substantial prejudice from this argument. The audio recordings referred to a "person with a gun" [259-3, at 34] and Plaintiff first elicited testimony from Zanyda that Plaintiff's house is across the street from one school and a block away from another [259-2, at 22]. The term "gunman" and similar variations were used throughout the entire trial by witnesses and attorneys for both sides. [See, *e.g.*, 259-2, at 103; 259-3, at 166; 259-4, at 8, 126, 141 164; 295-5, at 81.] The fact that a suspect who had a gun had fled through an area with three schools was a fact elicited from numerous witnesses, and Plaintiff was not denied a fair trial simply because those facts were repeated during closing argument with rhetorical flourish. Regardless, the Court instructed the jury that attorney' statements were not evidence [253, at 7], which "mitigate[d] harm that may otherwise have resulted from improper comments during closing argument." *Soltys*, 520 F.3d at 745. A new trial will not be granted on this basis.

## C.     Jury Instructions

District courts have "substantial discretion with respect to the precise wording of jury instructions so long as the final result, read as a whole, completely and correctly states the law." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). A court must "'ask if the correct message was conveyed to the jury reasonably well * * * by examining the instructions as a whole, in a common sense manner, avoiding nitpicking.'" *Saathoff v. Davis*, 826 F.3d 925, 932

(7th Cir. 2016) (citation omitted). "'If the instructions fail in this regard, a new trial is appropriate only if the instruction prejudiced the complaining party.'" *Id.* (citation omitted); see also *Viramontes v. City of Chi.*, 840 F.3d 423, 428 (7th Cir. 2016) ("Reversal due to an improper jury instruction is warranted only if the 'instruction misstates the law in a way that misguides the jury to the extent that the complaining party suffered prejudice.'"). "In other words, even if the jury instructions in this case were erroneous, if the applicable principles of law were communicated to the jury—through the arguments or evidence, for example—then [Plaintiff] does not deserve a new trial." *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).

Plaintiff argues that the Court offered three instructions that were "unsupported by the evidence and that ultimately caused confusion." [259, at 45.] First, Plaintiff argues that Defendants "did not lay out any factual scenario under which Plaintiff could have been convicted of any crime except resisting arrest" and thus no *Devenpeck* instruction was warranted. [271, at 29.] For Plaintiff's false arrest claim, the Court instructed the jury that "[i]t is not necessary that Defendant had probable cause to arrest Plaintiff for all of the crimes he was charged with, so long as Defendant had probable cause to arrest him for one of those crimes." [253, at 43.] Plaintiff does not challenge the text of the instruction, only whether the evidence supported it.

Here, officers charged Plaintiff with two different crimes—resisting and obstructing—based on their interactions with Plaintiff in his home. As the analysis above shows, a reasonable jury could find there was probable cause for both crimes based on the evidence presented. Nevertheless, "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Holmes*, 511 F.3d at 682. "[I]t is not relevant whether probable

cause existed with respect to * * * any charge actually invoked by the arresting officer at the time of arrest." *Jackson*, 627 F.3d at 639 (citation and internal quotation marks omitted). Thus, Plaintiff's concession that there *was* a "factual scenario" in which "Plaintiff could have been convicted of * * * resisting arrest" establishes that there was a sufficient evidentiary basis to give the *Devenpeck* instruction.[8] So long as there was probable cause to arrest him for resisting arrest, Plaintiff's false arrest claim is foreclosed regardless of the merits of the obstructing charge. See *Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011).

Second, Plaintiff argues that "the Court did not fully apprise the jury on the resisting arrest statute," because "Defendant repeatedly misrepresented that Plaintiff could be convicted of obstruction for using words, but the law is clear and unambiguous on this point." [271, at 29.] Plaintiff is wrong on the process, the law, and the facts. The Court offered the parties a more fulsome instruction on this resisting arrest statute that tracked the Seventh Circuit's analysis in *Abbott*. Given the choice between this instruction and language that simply tracked the statute without elaboration, Plaintiff chose the latter. [See 259-6, at 20–28.] Plaintiff cannot now claim a fuller instruction beyond the statutory text was warranted.

Furthermore, Illinois law is not "unambiguous" as to when words may constitute obstruction. The Seventh Circuit explained that the "greatest difficulty" exists in determining the point at which "mere verbal argument * * * becomes * * * obstruction." *Abbott*, 705 F.3d at 722. And Plaintiff conceded during the jury instruction conference that words alone could become obstruction even though the words on their face are not deceptive or misleading. [See 259-6, at 28 ("You know, when the officer says, 'Get on the ground. Get on the ground' and you're, like, 'Why? Why? Why?' At some point that becomes not argument, it becomes

---

[8] Defendants correctly note that the issue is not whether Plaintiff could have been "convicted" of obstruction [271, at 29], only whether an officer reasonably believed that Plaintiff had "committed" this (or any other) offense. *Holmes*, 511 F.3d at 682.

physical act.").]  Regardless, the evidence at trial suggested that Plaintiff did more than simply argue with the officers.  There was testimony that Plaintiff struggled with the officers, flailed his arms, and pulled his arms away as the police tried to handcuff him.  Plaintiff's belated contention that this was an "involuntary reflex" implicitly concedes he did more than argue.  [259, at 37.]  Thus, even if an instruction that "verbal argument alone" does not constitute obstruction should have been given, Plaintiff suffered no prejudice from its omission based on the facts of this case.

Third, Plaintiff argues that "the Seventh Circuit is not following the best practice as to the allocation of the burden of proof in warrantless Fourth Amendment cases" [277, at 14], and "the Seventh Circuit got the burden of proof issue right in *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) and not in *Bogan*" [259, at 45].  In other words, Plaintiff acknowledges that *Bogan* remains good law [259-5, at 211–12], but contends it was wrongly decided [259, at 45–46].  Plaintiff is free to raise this issue on appeal, but this Court is bound to follow Seventh Circuit precedent that "plaintiff must bear the ultimate burden of nonpersuasion" regarding the existence of exigent circumstances in a Section 1983 warrantless-search action.  *Bogan*, 644 F.3d at 568–71.  Plaintiff's "burden of proof" jury instruction argument is denied.

D.    **Evidentiary Rulings**

"Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order."  Fed. R. Civ. P. 61.  "The court must disregard all errors and defects that do not affect any party's substantial rights."  *Id.*  "Evidentiary errors satisfy this standard only if there is a significant chance that they affected the outcome of the trial."  *Griffin v. Bell*, 694 F.3d 817, 827 (7th Cir. 2012).

Plaintiff challenges three categories of evidentiary rulings.

### 1. Evidence Regarding Alberto's Arrest

First, Plaintiff argues that Defendants "obstructed" Plaintiff "from discovery of facts related to Alberto's arrest," but Plaintiff was denied the opportunity to "argue this case without * * * witnesses testifying about the circumstances of Alberto's arrest." [259, at 46–47.] The Court denied Plaintiff's motion *in limine* on this issue [217, at 38–39], and Plaintiff offers no legal authority that this was error or that a categorical exclusion of this evidence was required. The circumstances surrounding Alberto's pursuit and arrest were highly probative of the existence and nature of any exigency and the probable cause findings that the jury was required to make here, which substantially outweighs the potential unfair prejudice (if any).

To the extent that Plaintiff contends that Defendants should have been "estopped" from presenting this evidence based on the Magistrate Judge's rulings during Officer Carlos Aldana's deposition [259, at 46–47], the Court is not persuaded. The Magistrate Judge addressed a narrow issue: whether Plaintiff's counsel could ask this deponent if other people could see Alberto when he was arrested, which occurred at a different location and after Plaintiff was in custody. [154-1, at 2.] The Magistrate Judge properly found this issue was irrelevant and Plaintiff's counsel agreed to stop asking these questions. *Id.* at 3–5. The Magistrate Judge then noted that if Defendants tried to offer at trial "the very thing that they were successful" in barring questions on in the deposition, then there might be an estoppel issue. *Id.* at 5. Plaintiff's motion *in limine*, however, swept significantly broader, seeking to preclude whole swaths of evidence related to the search for Alberto, going so far as to claim that "the identity of the suspect chased into 2622 W. 55th Street and his relationship to the area, the lawsuit, and Daniel in general, is irrelevant." [141, at 2–4.] That argument was untenable, and bore no reasonable relationship to the issue addressed by the Magistrate Judge. Plaintiff does not identify an instance from the trial where

the "very" testimony that he tried to discover from Officer Aldana was offered by Defendant, or articulate how introduction of evidence on this narrow issue changed the case's outcome.

### 2. Evidence Regarding Officer Bogdalek

Second, Plaintiff argues that the Court committed several evidentiary errors in connection with Officer Bogdalek's testimony. Plaintiff argues that the Court erred in limiting questions related to Officer Bogdalek's prior invocation of the Fifth Amendment during her deposition. According to the questions that Plaintiff filed [276],[9] his attorney sought to ask two questions of Officer Bogdalek, namely, "You invoked the Fifth Amendment privilege against self-incrimination when asked in [your deposition] whether you had conversations with Jeffrey Weber" or anyone "about the criminal prosecution of the Martinez family." The Court had previously granted Plaintiff's motion *in limine* to exclude evidence that Plaintiff had asserted his Fifth Amendment privilege during his deposition [217, at 40]. Accordingly, the Court ruled that, under Federal Rule of Evidence 403, these questions of Officer Bogdalek would likely lead to additional questions on irrelevant, collateral issues (and potentially open the door to Plaintiff's assertion of his Fifth Amendment privilege in his depositions), and were of limited probative value. Plaintiff's motion offers no law that this result is in error, or how—given Officer Bogdalek's minimal, tangential role in this case—this exclusion affected his substantial rights.

Plaintiff also argues that the Court erred in limiting evidence of Officer Bogdalek's prior perjury-related misconduct [217, at 15–19]. Plaintiff argues that "Bogdalek followed the same game plan in [a prior case] as she did here, lied in the same way, which is no accident, and made an agreement to lie, which also happened in the Martinez lawsuit." [259, at 48.] He argues "[s]taying silent was part of a plan" and "[f]orgetting material facts was part of a plan." *Id.* In

---

[9] Plaintiff did not file this handwritten list of questions until after Defendants filed their response brief. The Court assumes, without deciding, this belated filing qualifies as a timely offer of proof. Otherwise, this issue has not been preserved. *Wilson v. City of Chi.*, 758 F.3d 875, 885 (7th Cir. 2014).

other words, Plaintiff believes that Bogdalek is following the same "plan"—lying, staying silent, and conveniently forgetting—in this lawsuit that she did previously. That is propensity evidence barred by Rule 404(b). Officer Bogdalek has a "pattern" of conspiring to lie, and did so here too. However, the Court permitted Plaintiff to question Officer Bogdalek on these credibility-related issues consistent with Federal Rules of Evidence 401, 403, 601, and 608 [217, at 15–19]. And Plaintiff asked Officer Bogdalek about these issues at trial, and she asserted her Fifth Amendment right in the presence of the jury [259-4, at 216–18, 244], which was instructed on the inferences they could draw from that testimony [253, at 14]. Plaintiff does not offer any new argument or case law as to how this was error, let alone affected the outcome of this case.

Moreover, Plaintiff argues that the Court erred in denying his motions for sanctions or judicial notice [242]. The basis for Plaintiff's motion was that the jury heard a radio transmission from a female officer stating, "He's coming through the back" [259-4, at 819], Officer Bogdalek testified that she could not say "with 100 percent certainty" it was her (although she admitted it was "possible") (*id.*), and Officer Joaquin Salazar testified that one of the officers on the patrol was named "Kathy," whom he described as "White female, blonde hair, maybe about 5'10"" [259-5, at 115]. From these strands, Plaintiff weaves the following argument: Kathy refers to Kathy McLean, and this testimony shows that she "resembles" Officer Bogdalek, which means Defendants' theory must be that Officer McLean (not Officer Bogdalek) was the person at the scene who observed Plaintiff enter the back of his home and made this transmission. [242, at 1–2.] Defendants did not identify Officer McLean as a witness during discovery, and thus the Court was required to instruct the jury that Officer McLean was *not* the speaker on the radio, instruct the jury that Defendants engaged in discovery misconduct, or give the missing witness instruction to remedy this discovery violation. *Id.* at 2–3.

The Court explained its reasons on the record for denying Plaintiff's motion. [See 259-6, at 4–8.] The Court summarized the evidence that the jury had heard, the parties' stipulation regarding testimony from Officer Bogdalek's partner that the voice on another police dispatch recording sounded like Officer Bogdalek, the evidence that was disclosed to Plaintiff during discovery, and how Plaintiff might have identified Officer McLean during discovery. *Id.* The Court concluded that there were no discovery violations, and expressed its view that Plaintiff still had the stronger argument that the voice on the recording was Officer Bogdalek. *Id.* at 7–8. The Court further noted that Plaintiff had delayed in raising this issue until after the Court had already informed the jury they were finished hearing evidence, which cautioned against giving any such instruction. *Id.* at 8; [259-5, at 181].

Plaintiff's motion for a new trial does not address the Court's ruling, explain why it was wrong, or cite any law suggesting this issue entitles him to a new trial. As the Court explained, Officer Bogdalek's testimony and the parties' stipulation indicated that Plaintiff had the stronger argument as to whose voice was on the recording. But assuming it was Officer McLean's voice, Plaintiff does not meaningfully articulate how this prejudiced him in his claim against Officer Bogdalek. As he admitted in his original motion, "if in fact the voice on the radio turns out to be Kathy McLean, the parties wasted a ton of money and time litigating the entire case against Ms. Bogdalek, given that the lynchpin of Plaintiff's theory against Ms. Bogdalek has always been that her voice is the radio identifying Plaintiff as entering his home." [242, at 2.] Thus, if the truth is that the voice belonged to Officer McLean, it is difficult to see how justice required granting Plaintiff's request to instruct the jury that it was *not* her voice. *Id.* In the end, Plaintiff merely argues that he should have received "some relief" from the Court for this belated motion

[259, at 49].  A vague demand that Plaintiff deserved *something* when this issue arose falls well short of demonstrating errors affecting his substantial rights that warrant a new trial.

### 3.  Plaintiff's Prior Lawsuit

Under a section titled "The Perception of Plaintiff" [259, at 49], Plaintiff contends that the Court erred by excluding certain evidence related to his 2009 civil rights lawsuit against Officers Weber and Bogdalek stemming from a September 2008 incident.  The Court granted Defendants' motions *in limine* to exclude this evidence and explained that—other than the lawsuit's existence—information about the claims raised, case's resolution, settlement amounts, and attorneys' fees were inadmissible under Federal Rules of Evidence 401, 403, and 404.  [217, at 20–23.]

Plaintiff argues that the Court "allowed the jury to infer that the Plaintiff had filed an unmeritorious lawsuit once and was pursuing the claims at issue for an improper reason, such as Plaintiff's litigious character."  [259, at 50.]  He offers nothing to substantiate that speculation or (again) law suggesting that the Court erred.  Moreover, the parties stipulated that Plaintiff had filed a civil lawsuit that was resolved in 2014.  [259-2, at 146.]  If this stipulation would lead the jury to speculate that this lawsuit was unmeritorious or pursued for improper reasons, Plaintiff does not explain why that is the case.  Moreover, Plaintiff's argument that he should been able to admit evidence about the "judgment * * * obtained against the City" or evidence of "CPD's unlawful search" [259, at 50] only highlights the likelihood that the jury would have been misled.  This was a *settlement* with the City of Chicago, which is not a Defendant in this case for liability purposes, and this settlement did not admit liability.  [217, at 23.]  The danger that the jury would misuse a prior settlement against the *City* to show that Plaintiff's lawsuit here against the *officers* is "meritorious" substantially outweighs any probative value from this evidence.  *Id.*

Plaintiff also moved *in limine* to exclude evidence of his prior arrests and convictions, which the Court granted with Defendants' condition—unopposed by Plaintiff—that Plaintiff not testify that he has never been arrested before. [217, at 43–44.] At trial, Defendants' counsel asked Plaintiff if he had "ever been arrested before," and the Court sustained an objection before Plaintiff answered. [259-2, at 175.] Plaintiff's counsel moved for a mistrial, which the Court denied, and then Plaintiff's counsel asked to clarify for the jury that this arrest was in connection with the 2009 civil case (*id.* at 177). The Court allowed that testimony to be elicited. *Id.* at 178.

Plaintiff now contends that sustaining the objection and eliciting this additional testimony did not cure Defendants' "violation" of the motion *in limine* ruling because the Court should have also allowed Plaintiff to offer evidence that his "first arrest was meritless or that it resulted in a judgment against the City of Chicago." [259, at 50.] When this issue arose, Plaintiff did not request either remedy. Nor would delving into the irrelevant substance of the 2008 arrest and 2009 lawsuit cure the minimal (if any) prejudice created by Defendants' counsel asking one unanswered question, especially in light of the parties' stipulation about this lawsuit. Even assuming that merely asking this question violated the motion *in limine* ruling—and, as the Court noted at the time, it arguably did not [259-2, at 243]—Plaintiff fails to direct the Court to any law that would justify ordering a new trial based on this largely insignificant issue.

Accordingly, Plaintiff's Rule 59 motion is denied.

## V.      Bill of Costs

Rule 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The rule "provides a presumption that the losing party will pay costs but grants the court discretion to direct otherwise." *Rivera v. City of Chi.*, 469 F.3d 631, 634 (7th Cir. 2006). The Seventh Circuit recognizes "only two situations in which the denial of costs might be warranted: the first involves misconduct of the party seeking costs,

and the second involves a pragmatic exercise of discretion to deny or reduce a costs order if the losing party is indigent." *Mother & Father v. Cassidy*, 338 F.3d 704, 708 (7th Cir. 2003); *see also Rivera*, 469 F.3d at 634–35. Taxing costs against the non-prevailing party requires two inquiries: (1) whether the cost is recoverable; and (2) whether the amount assessed is reasonable. See *Majeske v. City of Chi.*, 218 F.3d 816, 824 (7th Cir. 2000). The list of recoverable costs pursuant to 28 U.S.C. § 1920 includes (1) fees of the clerk and marshal, (2) fees for transcripts, (3) witness fees and expenses, (4) fees for copies of papers necessarily obtained for use in the case, (5) docket fees, and (6) compensation for court-appointed experts and interpreters. See *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.,* 481 F.3d 442, 447 (7th Cir. 2007).

In total, Defendants seek $15,626.36 in costs for transcripts, witnesses, service of process, photocopying, and interpreters. Before turning to the bill of costs' substance, the Court first addresses Plaintiff's arguments that the Court should deny all costs to Defendants.

### A. Whether to Deny All Costs to Defendants

Plaintiff advances four arguments for denying Defendants all of their costs. First, Plaintiff claims that Defendants' bill of costs "provide[s] no reasoning for the amounts of the bill claimed" and because they do not "justify the reasonableness or necessity" of each specific cost incurred sufficiently, their costs should be denied entirely. [273, at 2–3, 5.] Plaintiff's stringent interpretation of Rule 54(d) would reverse the presumption in favor of awarding costs to the prevailing party. And there is no reason for doing so here. Plaintiff cannot seriously contend that the Court should deem unreasonable Defendants' decision to order transcripts of Plaintiff's own deposition. The same goes for the transcripts of deponents on Plaintiff's will and may call list [142, at 4–7.]. In fact, the reason for nearly all of these costs is self-evident, and where they are not, Defendants sufficiently explain why they seeking them (with a few exceptions).

Second, Plaintiff argues that Defendants' "joint" motion for costs runs afoul of Rule 54(d) because it "lumps all of the costs incurred by the defendants together making it impossible for the Court or Plaintiff to determine which costs certain Defendants might be entitled to over others." [273, at 4.] The Court sees no problem with the joint filing here. This is not a case where Plaintiff prevailed on some of his claims against some Defendants but not others, Defendants lost their counterclaims, or there was no judgment on the merits. Cf. *Dobrzeniecki v. Brown*, 2015 WL 2208341, at *2 (N.D. Ill. May 8, 2015) (declining to award costs after dismissing malpractice claim on jurisdictional grounds under 28 U.S.C. § 1367(a), which meant there was no "prevailing party"). All Defendants here prevailed against Plaintiff on all claims.

Relatedly, Plaintiff argues that the Court should deny costs to Officer Bogdalek based on her alleged failure to disclose Officer McLean. [273, at 4–5.] The Court will not use Rule 54 to sanction Officer Bogdalek after already deciding that no discovery violation occurred. [See 259-6, at 4–8.] Nor is the fact that Officer Bogdalek "incurred a significant share of the costs of this lawsuit" [273, at 4] a reason to deny her costs. Indeed, it only undermines Plaintiff's claim that it is "impossible" to decide which Defendant incurred which costs. *Id.* Plaintiff also urges the Court to deny all costs to the City of Chicago because they were "named in the lawsuit for indemnification and respondeat superior purposes only," and the Court ordered that they could not be mentioned during the trial. [273, at 5.] Plaintiff cites no case law to justify such an exclusion, and the Court is aware of none. The fact that City indemnifies officers for their defense of Section 1983 claims is a reason *to* award them costs, not withhold costs from them.

Third, Plaintiff argues that Defendants have failed to distinguish the costs incurred in defending this lawsuit with the costs related to the 2009 lawsuit. [273, at 5–6.] For this argument, Plaintiff mainly relies on his claim that the depositions of Officer Bogdalek and Cook

County Assistant State's Attorneys ("ASA") David Mullner and Margaret Mendenhall occurred before this case was filed. *Id.* Defendants respond that all of these transcripts were ordered after this lawsuit was filed [261-3, at 2, 15–18], the two ASAs were in fact deposed in March 2015 (not before this case was filed) [274, at 2], all three witnesses were on Plaintiff's will call list [142, at 4–5], and Officer Bogdalek is a named party. Plaintiff's speculation that Defendants are trying to subsidize costs related to the 2009, without more, is insufficient to cast doubt on these facts and Defendants' representation that these transcripts were necessary to their defense.

Fourth, Plaintiff seeks to invoke the indigency exception to Rule 54. "[I]ndigence does not automatically excuse the losing party from paying the prevailing party's costs." *Rivera*, 469 F.3d at 635. To avail himself of this exception, Plaintiff bears the burden to provide this Court with "sufficient documentation * * * in the form of an affidavit or other documentary evidence of both income and assets, as well as a schedule of expenses" such that the Court can make a factual finding that Plaintiff is "incapable of paying the court-imposed costs at this time or in the future." *Id.* (citation and internal quotation marks omitted). After that showing is made, the Court will consider "the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised by a case when using its discretion to deny costs." *Id.* "Actual indigency, not merely limited financial resources, must be demonstrated." *Tumas v. Bd. of Educ. of Lyons Twp. High Sch. Dist. No. 204*, 2008 WL 611601, at *1 (N.D. Ill. Feb. 29, 2008).

Plaintiff submitted a "declaration" "pursuant to 28 U.S.C. § 1746" that represents he earns $1,800 after taxes per month and works as a roofer, but has variable hours depending on the season. [273-1, at ¶ 1.] Plaintiff has $2,500 in savings, a car with at most a $599 trade-in value, and no real estate or other assets of worth. *Id.* at ¶¶ 2-3. Moreover, Plaintiff has $500 in monthly rent, $150 in monthly utility costs, $300 to $500 in monthly food expenses, $120 to

$150 per month in gas, $50 in monthly auto insurance payments, and $60 per month in dog-related expenses.  *Id.* ¶¶ 5–9.  Plaintiff also has $1400 in credit card debt, which he pays off at $200 per month.  *Id.* ¶ 4.

Defendants urge the Court to strike Plaintiff's filing because it is undated, electronically signed, and omits Section 1746's mandated language, "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.  Executed on (date).  (Signature)." 28 U.S.C. § 1746(2).  In various contexts, courts have stricken "declarations" with these deficiencies, noting that "compliance with 28 U.S.C. § 1746 is mandatory and fundamental, not a 'non-substantive' requirement."  *Knights v. Williams*, 2005 WL 1838427, at *3 (N.D. Ill. July 28, 2005) (summary judgment); see also *Grayer v. Cerda*, 2014 WL 6713480, at *10 (N.D. Ill. Oct. 6, 2014) (motion for fees where the declaration sets out the attorney's hourly rate); *Kalra v. United States*, 2013 WL 1749385, at *2 (N.D. Ill. Apr. 23, 2013) (motion to dismiss based on sovereign immunity); *Tomasian v. C.D. Peacock, Inc.*, 2012 WL 2590493, at *2 n.2 (N.D. Ill. July 3, 2012) (motion to disqualify attorney).  Importantly, Plaintiff, who is represented by counsel, made no effort to remedy these shortcomings after Defendants pointed them out.[10]

Here, the lack of handwritten signature or certification that this filing is under "penalty of perjury" significantly reduces its persuasive force.  Furthermore, the Court does not know when these earnings and expenses purportedly represent Plaintiff's financial situation because his filing is undated, which inhibits the Court's ability to determine whether Plaintiff is "incapable of paying the court-imposed costs at this time or in the future."  Plaintiff does not otherwise support his filing with documentary evidence or meaningfully address his capacity to pay these fees in the future.  See *Huerta v. Vill. of Carol Stream*, 2013 WL 427140, at *2 (N.D. Ill. Feb. 4,

---

[10] This filing also is not an "affidavit," which is "a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath."  *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  The filing does not meet any of these requirements beyond being a written statement.

2013) (denying unemployed plaintiff's indigency claim because he failed to submit a schedule of his expenses or any documentation other than an affidavit); see also *Rivera*, 469 F.3d at 635 ("Requiring a non-prevailing party to provide information about both income/assets and expenses will ensure that district courts have clear proof of the non-prevailing party's dire financial circumstances."). Plaintiff is 25 years old [see 259-2, at 123], and thus presumably on the upward trajectory of his earnings curve, which undercuts any suggestion of a reduced capacity to pay in the future. In any event, even accepting Plaintiff's representations about his net monthly earnings, his annual income exceeds the 2017 Department of Health and Human Services' poverty guidelines (available at https://aspe.hhs.gov/poverty-guidelines) for a one-person household.[11] "While the Court sympathizes with Plaintiff's circumstances, it cannot determine that Plaintiff is indigent on the basis of the documentation provided." *Lewis v. City of Chi.*, 2012 WL 6720411, at *3 (N.D. Ill. Dec. 21, 2012). Accordingly, the Court will not deny costs to Defendants on this basis.

### B.     Transcription Costs

Defendants seek $14,025.99 in court reporting and transcription fees pursuant to 28 U.S.C. § 1920(2), which is the bulk of their costs. [See 263, at 3.] The Court awards deposition charges if the deposition appears reasonably necessary in light of the facts known at the time of the deposition. See *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008); *Mother & Father*, 338 F.3d at 712. These fees are recoverable regardless of "intervening developments that render the deposition unneeded for further use." *Mother & Father*, 338 F.3d at 712. Pursuant to Northern District of Illinois Local Rule 54.1(b), the costs of a transcript shall not exceed the regular copy rate established by the Judicial Conference of the United States.

---

[11] To the extent that Plaintiff is financially responsible for anyone else in his household, he does not provide the Court with information sufficient to make such a finding for purposes of this motion.

That rate is currently $3.65 per page for an original transcript, $4.25 per page for a 14-day transcript, $4.85 per page for a 7-day transcript, $6.05 per page for a daily-rate transcript. The rate is $0.90 for copies.

In this case, Defendants seek to recover the transcription costs for 25 depositions. Eight of these depositions were conducted by Defendants [261-1, at 1–2], and seventeen were conducted by Plaintiff (*id.* at 3–5). Defendants also seek to recover the transcription costs for Plaintiff's and Alberto's criminal trials (*id.* at 5–7), and the daily transcripts from the civil trial before this Court (*id.* at 8). The Court starts with the costs of the depositions conducted by Defendants, which Plaintiff challenges in various ways.

### 1. Depositions Conducted By Defendants

Defendants seek $4,667.89 in costs related to the depositions that they conducted. Plaintiff first argues "Defendants provide no basis for their decision to order transcripts of [three deponents], who were not called at trial by either party." [273, at 9.] All three deponents were listed on Plaintiff's Rule 26(a)(1) disclosures [274, at 3] and two of them (Plaintiff's parents) were on his trial witness list [142, at 4–5]. The third, Alberto Martinez, has obvious relevance to this case. The fact that these deponents were not called at trial is irrelevant. See *Mother & Father*, 338 F.3d at 712. However, Plaintiff challenges Defendants' asserted need for a $325 video of Alberto's deposition, in which he invoked his Fifth Amendment rights. "Generally, '[c]ourts in this circuit will not award costs for videotaping depositions where a transcript was also purchased.'" *SP Techs., LLC v. Garmin Int'l, Inc.*, 2014 WL 300987, at *5 (N.D. Ill. Jan. 10, 2014) (citation omitted). Defendants do not articulate how this video (separate from the transcript) was reasonably necessary, and the Court declines to award this cost.

Plaintiff also questions the need for ordering the deposition of a fourth deponent, Plaintiff's girlfriend Liliana Ramos, who testified at trial. [See 259-4, at 191–200.] Plaintiff argues that "the defense failed to ask Ms. Ramos any questions related to Plaintiff's damages" [273, at 9], but does not explain why Defendants had to cover this topic during their cross-examination or why this would preclude Defendants from recovering her deposition transcript costs. However, Plaintiff also asserts that "the defense seeks to impose a [$108] non-appearance fee on Plaintiff for Liliana Ramos, even though she was not she was not properly served with a subpoena." [273, at 9–10.] Defendants do not respond to this argument or explain this cost. Accordingly, the Court will deny that cost [216-1, at 2] to Defendants.

Plaintiff further argues that Defendants cannot recover transcript costs (including appearance fees) that exceed the transcript-fee rates established by the Judicial Conference of the United States. [273, at 8–9.] Several years ago, there was a split among the judges in this district on whether appearance fees could be awarded on top of the maximum allowable per page transcript fee. See *Harney v. City of Chi.*, 702 F.3d 916, 928 (7th Cir. 2012) (discussing the split). But our local rules have since been amended, and now provide that "[c]ourt reporter appearance fees may be awarded in addition to the per page limit, but the fees shall not exceed the published rates on the Court website unless another rate was previously provided by order of court." L.R. 54.1(b). The Northern District's website states that "the court reporter attendance fee shall not exceed $110 for one half day (4 hours or less), and $220 for a full day attendance fee." *United States District Court for the Northern District of Illinois*, http://www.ilnd.uscourts. gov/Pages.aspx?rsp2kxYIAI6Z3skP0PESA+q3bXKkfRyo (last visited March 30, 2017).

In accordance with these local rules and applicable rates, the Court reduces the transcription charges for the depositions taken by Defendants. Defendants may recover $617.35

for Vanessa Martinez's deposition (139 pages at $3.65/page, plus $110 for a 3-hour deposition), $646.55 for Alexander Matias's deposition (147 pages at $3.65/page, plus $110 for a 2.5-hour deposition), $825.40 for Daniel Martinez's deposition (196 pages at $3.65/page, plus $110 for a 3.5-hour deposition), $324.85 for Sofia Martinez's deposition (89 pages at $3.65/page), $255.50 for Meliton Martinez's deposition (70 pages at $3.65/page), $346.75 for Zanyda Martinez's deposition (95 pages at $3.65/page), $220 for the full day appearance fee for Sofia, Meliton and Zanyda's deposition, $337.25 for Liliana Ramos's deposition (65 pages at $3.65/page, plus the $100 appearance fee charged), and $256 for Alberto Martinez's deposition (40 pages at $3.65/page, plus $110 for a 2-hour deposition). This total comes to $3,829.65, a reduction of $838.24 from Defendants' request.

### 2. Depositions Conducted By Plaintiff

Defendants seek $5,882.50 in costs related to the depositions that Plaintiff conducted. Defendants argue that "[w]here the losing party arranges a deposition and therefore selects the rates charged by the court reporter, it is reasonable to award the prevailing party the full costs charged by the reporter for the deposition transcript." [263, at 4 (citing *Gyrion v. City of Chi.*, 454 F. Supp. 2d 725, 725 (N.D. Ill. 2006)). While that sentiment is generally true, it does not trump the transcription fee caps set by this Court's local rules. These limits apply to depositions initiated by the non-prevailing party as well.

Plaintiff repeats his argument that the Court should deny costs for the depositions of Officer Bogdalek and ASAs Mullner and Mendenhall because they were for the 2009 lawsuit. [273, at 10.] The Court has already rejected that argument. Plaintiff further contends that Defendants offer "no justification for ordering the transcripts for" six deponents [273, at 10–11],

all but two of which appear one of the party's witness lists [142, at 4–9]. If these transcripts were unnecessary, it begs the question of why Plaintiff took their depositions in the first place.

Plaintiff's other arguments have more merit. He contends that Defendants do not explain why they paid for $377.85 in expedited transcripts and processing the reservation signature. [273, at 10.] Many of these expedition requests occurred in 2014 and early 2015—more than a year before the trial. Defendants do not respond to these arguments, and the Court will deny those costs. Plaintiff also contends that Defendants wastefully ordered multiple copies of the depositions of Officer Weber, Officer Bogdalek, and Sergeant Lance Becvar. *Id.* at 10–11. Defendants' exhibit indicates that copies were ordered for different Defendants. [261-1, at 4–5.] That said, those copies may only be covered at $0.90 rate. In addition, although not raised by Plaintiff, the Court notes that "[c]harges for exhibit copies are not taxed as costs absent an explanation of why copies were necessary." *Plyler v. Whirlpool Corp.*, 2012 WL 5845428, at *2 (N.D. Ill. Nov. 19, 2012). Defendants seek roughly $50 in exhibit fees, but does not explain why they are necessary, and the Court will not award them.

Applying these rules and rates, the Court reduces the transcription charges for the depositions taken by Plaintiff. Defendants may recover $73 for Officer Bogdalek's 2013 deposition (20 pages at $3.65/page), $186.15 for Officer Chavez's deposition (51 pages at $3.65/page), $131.40 for Officer Carlos Cortes's deposition (36 pages at $3.65/page), $142.35 for Officer Roman Godinez's deposition (39 pages at $3.65/page), $153.30 for Officer James Haworth's deposition (42 pages at $3.65/page), $82.60 for Officer Salazar's deposition (28 pages at the rate charged, $2.95/page ), $168.15 for Officer Nunez's deposition (57 pages at the rate charged, $2.95/page), $252.10 for Officer Thomas Buehler's deposition (71 pages at the rate charged, $3.55/page), $42.60 for Officer Daniel O'Donnell's deposition (12 pages at the rate

charged, $3.55/page), $262.70 for Officer Aldana's deposition (74 pages at the rate charged, $3.55/page), $284.70 for Officer Rita Martinez's deposition (78 pages at $3.65/page), $213 for Erin Hansen's deposition (60 pages at the rate charged, $3.55/page), $642.40 for an original copy of Officer Weber's deposition (176 pages at $3.65/page) and $158.40 for another copy of Officer Weber's deposition (176 pages at $0.90/page), $405.15 for an original copy of Officer Bogdalek's deposition (111 pages at $3.65/page) and $99.90 for another copy of Officer Bogdalek's deposition (111 pages at $0.90/page), $173.25 for ASA Mullner's deposition (77 pages at the rate charged, $2.25/page), $245.25 for ASA Mendenhall's deposition (109 pages at the rate charged, $2.25/page), and $471.35 for an original copy of Sergeant Becvar's deposition (99 pages at $3.65/page, plus $110 for a 2-hour deposition) and $89.10 for another copy of Sergeant Becvar's deposition (99 pages at $0.90/page).[12]   This total comes to $4,276.85, a reduction of $1,605.65 from Defendants' request.

### 3.   Transcripts From The Criminal And Civil Trials

The law permits recovery for "fees for printed or electronically recorded transcripts necessarily obtained for use in the case," 28 U.S.C. § 1920, which includes trial transcripts and transcripts of other court proceedings.  *Majeske,* 218 F.3d at 825.  Defendants seek to recover $403.05 in costs for the transcripts from *People v. Daniel Martinez* (12-MC1-118061) and *People v. Alberto Martinez* (12-CR-02448(01) and (12-MC1-101566)).   Plaintiff claims that these costs are unreasonable because (1) some of them relate to irrelevant pretrial hearings, and (2)"certain [unspecified] transcripts" were produced in discovery.   [273, at 11.]   Plaintiff's criminal trial was of obvious relevance to Plaintiff's malicious prosecution claim, which is demonstrated most acutely by the need to obtain a copy of Officer Weber's testimony.  The same

---

[12] Defendants do not explain why it was reasonably necessary to obtain a video of John Keane's deposition, so that cost ($137.50) is not awarded.

goes for Alberto's criminal trials, where Plaintiff subpoenaed Officers Weber and Bogdalek as defense witnesses. [274, at 4.] Defendants appropriately sought a complete set of those proceedings directly from the Illinois trial court, and the Court has no hesitation in awarding these costs.

Plaintiff also challenges whether it was reasonably necessary for Defendants to seek expedited daily transcripts, Realtime, and copies during the civil trial, which cost $3,072.55. [261-1, at 8.] The Court agrees that this charge "was unquestionably a matter of convenience, not necessity." *Williams v. Valtierra*, 2002 WL 424634, at *3 (N.D. Ill. Mar. 19, 2002). Defendants contend that "there were many objections, sidebars, witnesses and instances of impeachment," and they used these transcripts to prepare the closing arguments. [274, at 4.] Of course, almost every trial has objections, sidebars, and inconsistent testimony by witnesses. Here, this six-day trial was not particularly lengthy or complicated, and did not involve a significant number of witnesses speaking a language other than English. See *Bogan v. City of Chic.*, 2010 WL 2635789, at *2 (N.D. Ill. June 28, 2010); *Giles v. Wyeth Inc.*, 2007 WL 2908894, at *2 (S.D. Ill. Oct. 3, 2007). Defendants had multiple attorneys present during the trial, and could have ordered transcripts on discrete and particularized topics if necessary. Thus, Defendants fail to justify these costs and the Court will deny them.

In total, Defendants are awarded $8,509.55 for transcript-related costs.[13]

### C.    Witness Fees

Defendants seek $526.53 in witness fees. Of this amount, $275.53 is fees for deposition subpoenas for Alberto Martinez, Meliton Martinez, Sofia Martinez, Alexander Matias, and

---

[13] Plaintiff also speculates that "the expenses in this case were incurred * * * because Defendants elected to replace the Corporation Counsel's office with a private law firm just before trial." [273, at 11.] Plaintiff does not identify a single deposition transcript or criminal trial transcript that was ordered as a result of this change in representation, which occurred in April 2016.

Liliana Ramos. [261-1, at 8.] The remainder is trial subpoena fees for Thomas Buehler, Vanessa Martinez, Zanyda Martinez, Sofia Martinez, and Meliton Martinez. *Id.*

Plaintiff argues that the Court should disallow deposition fees for Alberto, Meliton, and Sofia because they did not testify at trial. [273, at 12.] Again, these witnesses were on Plaintiff's initial disclosures and it was perfectly reasonable for Defendants to depose them in an effort to prepare their case. Plaintiff further argues that the Court should not award the trial subpoena fees for Officer Buehler and Vanessa and Zanyda Martinez because Plaintiff ultimately called Officer Buehler and Zanyda in his case, and Defendants "merely called" Vanessa in their case "for the purposes of impeachment." *Id.* If there was some way that Defendants could have ensured these witnesses would be present for the trial and not subpoenaed them, Plaintiff does not explain what it was. Calling a witness to impeach her does not preclude recovery of the costs to subpoena her. These costs are awarded without modification.

### D.     Service of Process

Costs incurred for using a private process server are recoverable under 28 U.S.C. § 1920(1) so long as they do not exceed fees charged by the United States Marshal Service. See *Collins v. Gorman,* 96 F.3d 1057, 1060 (7th Cir. 1996). As of 2016, the U.S. Marshals Service charge is $65.00 per hour, plus a fixed rate per mile. 28 C.F.R. § 0.114(3). In 2014, that amount was $0.56 per mile and in 2016, the amount dropped to $0.54 mile.

Defendants seek $442.14 for the private process server they used to serve Alberto Martinez, Meliton Martinez, Sofia Martinez, Vanessa Martinez, Alexander Matias, and Liliana Ramos. [263-1, at 9.] Defendants concede that the costs to serve these six people exceed the amount that the Marshals would have charged. [263, at 6.] They also assert that its process server "was required to travel throughout the City of Chicago" (*id.*), but they do not provide any

information by which the Court can access the number of miles that were traveled. In fact, it is the Court's understanding that four of these witnesses (Alberto, Meliton, Sofia, and Vanessa) reside together, and it appears that three of them were served together on the same day [261-1, at 9; 621-7, at 2–3.]. Nor do Defendants set out how many hours it took for its private process server to effect service. Accordingly, the Court will award $65 per subpoena, but will treat the subpoenas served on Alberto, Meliton, and Sofia as one subpoena. Counting four subpoenas, Defendants are awarded $260 in total.

### E. Photocopying Costs

Defendants seek to recover $256.70 in copying costs. This reflects 1,560 pages of photocopies as well as copies of the court files for two of the criminal cases involving Alberto and Plaintiff. [263, at 7.] For the photocopies, Defendants request $0.12 per black and white page and $0.25 per color copy. "Courts interpret 28 U.S.C. § 1920(4) to mean that photocopying charges for discovery and court copies are recoverable, given that the number of copies made and amount billed is reasonable, but charges for copies made solely for the convenience of counsel are not." *Stallings v. City of Johnston City*, 2016 WL 4474683, at *2 (S.D. Ill. Aug. 25, 2016). "[A] party is 'not required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs'" but "must provide at least enough information about the copies to allow the Court to conclude that they are recoverable under the statute." *Id.* (citations omitted).

Defendants submit that these copies were made "due to providing discovery to Plaintiff and because they were necessary to prepare for depositions, as well as preparing the exhibits for depositions, [and] the many motion briefings filed in this case." [274, at 6.] Moreover, "[m]any documents were also photocopied in preparation for trial, including the preparation of exhibit

binders for Plaintiff's counsel, the Court and the Court Reporter, as well as the multiple drafts and copies of the transcripts for the OEMC recordings." *Id.* Given the age of this case, the dozens of depositions that took place, the amount of briefing that occurred, and the transcriptions of the various audio records used at trial, the Court is convinced that the modest number of copies that Defendants submit were not merely for convenience and are recoverable under 28 U.S.C. § 1920(4). Defendants may recover $256.70 in copying costs.

F. **Interpreter Fees**

Defendants seek to recover $350 in interpreter fees because a Spanish interpreter was retained for the depositions of Zanyda, Sofia, and Meliton Martinez. [263 at 8.] Reasonable costs associated with oral interpreters are recoverable pursuant to 28 U.S.C. § 1920(6). Plaintiff again argues that these fees should not be recoverable "where the underlying depositions were not necessary for use at trial." [273, at 13.] All three witnesses were on Plaintiff's initial disclosures, were on Plaintiff's witness list [142, at 5], and Zanyda testified at trial. These witnesses "voiced a preference to have the assistance of a Spanish-speaking interpreter during their depositions." [274, at 3.] Plaintiff does not seriously contend otherwise. Therefore, these expenses were reasonable, and will be awarded as requested.

VI. **Conclusion**

For the foregoing reasons, the Court denies Plaintiff's motion for judgment as a matter of law and a new trial [259], and grants Defendants' bill of costs [260] as modified. Defendants are entitled to a total award of $9,902.78.

Dated: March 30, 2016

_____
Robert M. Dow, Jr.
United States District Judge